UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LACHIN HATEMI,

                        Plaintiff,

        v.

M&T BANK CORPORATION,

                   Defendant.

**REPORT AND
RECOMMENDATION**

13-CV-1103S

## I)  INTRODUCTION

      Pending before the Court is a motion (Dkt. No. 15) by defendant M & T

Bank Corporation ("M & T")[1] to compel *pro se* plaintiff Lachin Hatemi

("Hatemi") to pursue his claims in arbitration under the Federal Arbitration Act

("FAA"), 9 U.S.C. §§ 1–16 (Westlaw 2014), and to dismiss this case accordingly.

M & T argues that Hatemi entered an agreement when he opened his checking

account that included an arbitration provision.  According to M & T, the arbitration

provision covers any dispute related to the checking account, and Hatemi's claims

about overdraft fees relate to the account and services connected with it.  In

opposing the motion, Hatemi accepts the account agreement and arbitration

---

[1] M & T has asserted that Hatemi named it incorrectly in his complaint, and that its proper name is,
"Manufacturers and Traders Trust Company a.k.a. M & T Bank." (Dkt. No. 15-1 at 1.)  For now, the Court
will let the parties decide whether a motion to correct the caption will be necessary or whether a joint
stipulation is possible.

provision generally but argues that his claims fall outside their scope.  Specifically,

Hatemi argues that he never consented in writing to overdraft services, that any

claimed verbal consent is false and does not follow the appropriate regulations

anyway, and that he should not be forced to arbitrate a contract that never existed

and that would have been separate from the general account agreement.

The Court held oral argument on May 29, 2014.  For the reasons below, the

Court respectfully recommends denying M & T's motion.

## II) BACKGROUND

This case concerns allegations that M & T charged overdraft fees against

Hatemi's checking account even though Hatemi never requested overdraft services.

Sometime prior to August 19, 2011, Hatemi opened a checking account with

M & T.[2]  To open the account, Hatemi signed what appears to be a one-page

document called an Account Opening Request.  (Dkt. No. 15-2 at 2.)  The

Account Opening Request contains some basic information about Hatemi[3] and the

account in question and then states, *inter alia*, that Hatemi did "acknowledge

receipt of, and agree to all provisions of, the General Deposit Account Agreement,

---

[2] Paragraph 13 of the complaint states, "Plaintiff Lachin Hatemi opened an M & T Bank MyChoice Checking account in person on August 19th, 2011 at a local M & T Bank branch in Buffalo, New York."  M & T denied that paragraph in its entirety in its answer but admitted paragraph 14, which states that the overdraft charges in question began no earlier than August 19, 2011.

[3] The Account Opening Request contains private information that should not appear in the docket, per Rule 5.2(a) of the Federal Rules of Civil Procedure.  The parties are directed immediately to contact the Clerk of the Court to make arrangements ensuring that all of their filings comply with Rule 5.2(a).

Availability Disclosure for Consumer Deposit Accounts, the Specific Features and

Terms containing information about the account, the applicable fee schedule and, if

the account is a Jumbo Certificate of Deposit, the Agreement for Telephone

instructions." (*Id.*)

The General Deposit Account Agreement ("Agreement") that Hatemi

entered when opening his account contains several provisions that potentially affect

the pending motion.  Under a heading titled "Governing Documents," the

Agreement states, "The governing documents for your account will be: 1. This

agreement; 2.  The Specific Features and Terms; 3.  Applicable fee schedules; 4.

Availability Disclosure for Consumer Deposit Accounts; 5. The Notice Regarding

Insufficient Funds, Overdrafts and Order of Payment of Debit Items; and 6.  The

applicable Consumer Deposit Account Opening Request/Confirmation Form,

Consumer Application and Signature Card or similar account opening form."  (Dkt.

No. 15-2 at 7.)  Apart from item number five, which concerns notice, the list of

governing documents does not include any documents concerning consent to

overdraft services.  The next paragraph states, "Other than any agreement between

you and us concerning deposits in or withdrawals from your account made in a

particular way, **the governing documents for your account are the final and**

**complete agreement between you and us concerning your account.  Any statement**

concerning your account made by any of our employees or anyone else is not part of that agreement." (*Id.*; emphasis added.) The only references to overdrafts in the Agreement seem to highlight the absence of overdraft operating documents from the above list of governing documents. When describing payment of debit charges, the Agreement states, "If your account does not contain sufficient available funds to pay the Debit Item, we will, in our sole discretion, decide whether to pay or return the Debit Item (**unless you have an Overdraft Arrangement** that fully covers the amount by which the Debit Item exceeds your available balance, in which case we will pay the Debit Item)." (*Id.* at 11; emphasis added.) Just a little farther down, the Agreement then states, "If we pay any Debit Item that overdraws your account, you must immediately pay us the amount of the overdraft **unless the overdraft is fully covered by an Overdraft Arrangement**." (*Id.*; emphasis added.) The Agreement repeats similar language just a few lines down and then contains one more paragraph that reads, "If you use an Overdraft Arrangement to cover the amount of a Debit Item posted against insufficient available funds, you must pay all charges relating to use of the Overdraft Arrangement." (*Id.* at 12.)

In one section titled "Giving Up of Rights," the Agreement contains the following language: "None of our rights with respect to you or your account can be given up by us except in a writing signed by us. In the event that any action relating

to your account or this Agreement should be maintained in any court, (i.e., any matter other than a dispute covered by the arbitration provisions of this Agreement), we and you each waive any right to a jury trial." (*Id.* at 15.)  In a section titled "Legal Proceedings," the Agreement contains the following language: "Before you commence any legal proceeding (including any arbitration proceeding) relating to a Claim, you must first contact us about the Claim and give us an opportunity to resolve it.  Similarly before we commence a legal proceeding (including any arbitration proceeding) relating to a Claim, we must attempt to resolve it with you.  If any such Claim cannot be resolved within 60 days from the date you or we are notified about it, the Claim may proceed to arbitration or other legal proceeding in accordance with this Agreement." (*Id.* at 19.)  A section titled "Evidence" states, "In any legal proceeding (including any arbitration proceeding between you and us) involving your account or any governing document for your account, any copy of that governing document kept by us in the regular course of our business is to be admitted in evidence as an original of that governing document." (*Id.*)

A critical factor in the Agreement and the pending motion is the Agreement's arbitration provision.  The Agreement contains a number of provisions regarding procedure once arbitration begins but contains one principal provision setting up

5

arbitration.  Because of its relevance to the pending motion and for the sake of

completeness, the Court reproduces that arbitration provision here in its entirety:

> Agreement to Binding Arbitration.  Each dispute or controversy that
> arises out of or is related to your account with us, or any service we
> provide in connection with your account, or any matter relating to
> your or our rights and obligations provided for in this agreement or
> any other agreement between you and us relating to your account or a
> service provided by us in connection with your account, whether based
> on statute, contract, tort, fraud, misrepresentation or any other legal or
> equitable theory, including any claim for interest and attorney's fees,
> where applicable (any "Claim"), must be determined on an individual
> basis by binding arbitration in accordance with the Federal Arbitration
> Act ("FAA"—Title 9 of the United States Code) under the auspices of
> the American Arbitration Association ("AAA").  Judgment on an
> arbitration award may be entered in any court having jurisdiction.  This
> arbitration provision applies to all Claims regardless of whether such
> Claims seek monetary, injunctive or declaratory relief or a combination
> of such types of relief.  Any issue regarding the validity or enforceability
> of the arbitration obligations set forth in this Agreement, and any issue
> regarding whether a particular dispute or controversy is a Claim that is
> subject to arbitration, shall be decided by the arbitrator.

(*Id.* at 18.)

The only other part of the Agreement that appears to be relevant, though not

in dispute, is the provision setting forth that New York law governs the account and

any governing document for the account.  (*Id.* at 19.)

At this point, the record either begins to lose clarity about what happened

next or begins to show where the parties' contentions diverge.  Of the six governing

documents listed at the beginning of the Agreement, only the Agreement itself and

the Account Opening Request appear in the record.  Hatemi does not appear to dispute that he received all of the governing documents.  The parties dispute sharply whether Hatemi responded to any notice regarding overdrafts.  Hatemi denies consenting to overdraft services at all.  Paragraphs 22 and 23 of the complaint are somewhat ambiguous on this point, perhaps because of *pro se* draftsmanship, but Hatemi clarified his denial in his opposition papers and at oral argument.  While taking a guarded approach to this case out of fear of waiving its rights to arbitration, M & T concedes that no written consent to overdraft services exists.  M & T asserts that Hatemi verbally consented to overdraft services and that verbal consent suffices.  The parties do agree that, between August 19, 2011 and May 15, 2012, M & T assessed overdraft fees 16 times.  Hatemi clarified at oral argument that all 16 transactions in question were either one-time debit transactions or Automated Teller Machine ("ATM") transactions.  The exact chronology is not clear, but sometime after the overdraft charges began, Hatemi met with M & T representatives regarding his concern that he never authorized overdraft services and thus the charging of overdraft fees.  When Hatemi's initial communications with M & T proved unsatisfactory, Hatemi filed a complaint with the federal Consumer Financial Protection Bureau ("CFPB") approximately in mid-summer 2013.  Hatemi has not

provided any information about the outcome of any CFPB proceedings that ensued, except to assert that M & T responded to the CFPB around early August 2013.

Hatemi commenced this case by filing his complaint on November 8, 2013. The complaint contains one claim accusing M & T of violating the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693–1693r (Westlaw 2014). Specifically, Hatemi asserts in his claim that M & T did not obtain written consent for overdraft services and that both the EFTA and associated regulations and commentary require written consent before a customer can "opt in" and receive overdraft services. Hatemi's demands for relief again reflect *pro se* draftsmanship, but the demands include a demand for declaratory judgment concerning the improper nature of verbal consent; a demand to "order" M & T to eliminate any policies regarding verbal consent, which perhaps could be interpreted as a demand for injunctive relief; a refund of overdraft fees plus costs; and punitive damages. M & T answered the complaint on December 26, 2013. At oral argument, M & T stated that, prior to the commencement of this case, it began the process of changing its policies to require written consent for overdraft services. M & T did not complete that process or refund any overdraft fees before the case began. Hatemi asserted at oral argument that, as of January 1, 2014, M & T requires written consent for new customers but has not addressed existing customers.

8

M & T filed the pending motion on April 11, 2014.  The motion is somewhat circumspect because, again, M & T currently is wary of litigating to the point of waiving any of its arbitration rights.  Nonetheless, M & T notes that Hatemi does not dispute any aspect of the Agreement, including the existence and validity of the arbitration provision in it.  From there, M & T argues that the arbitration provision is broad enough to encompass Hatemi's claim.  According to M & T, the arbitration provision covers any dispute that "arises out of or is related to" Hatemi's checking account.  Since overdraft fees charged to Hatemi's checking account obviously would relate to that account in a common-sense way, M & T concludes that Hatemi must continue his dispute in arbitration.  To support its argument, among other citations, M & T cites *Given v. M & T Bank Corp. (In re Checking Account Overdraft Litig.)*, 674 F.3d 1252 (11th Cir. 2012), and asserts that Hatemi must proceed to arbitration for the same reason that arbitration was required in *Given*.

Hatemi opposes the pending motion and its attempt to send his claim to arbitration.  Hatemi argues that the contract governing his claim would have been the written consent required by the EFTA, except that no such contract ever existed.  The Agreement with its arbitration provision cannot govern here, according to Hatemi, not only because it does not set up consent for overdraft

9

services but also because the EFTA, as amended by the Dodd–Frank Wall Street

Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124

Stat. 1376 (2010), requires consent to overdraft services to be separate from general

account agreements.  Hatemi then reiterates his argument that the EFTA and

associated regulations require written consent for overdraft services.  Hatemi

concludes that *Given* is distinguishable from his case because its underlying events

predated Dodd-Frank and because it focused on unconscionability of an account

agreement, a different issue.

III)   DISCUSSION

    A)       *Standing*

       Before the Court addresses any other aspect of the pending motion or this

case generally, it must confirm that it has subject-matter jurisdiction.  *See* 9 U.S.C.

§ 4 (limiting motions to compel arbitration to "any United States district court

which, save for such agreement, would have jurisdiction under Title 28").   The

parties have not raised the issue of subject-matter jurisdiction, but the Court raised

it on its own at oral argument; the Court was concerned that the overdraft fees in

question might not suffice to give Hatemi standing, especially if M & T already had

changed its policies and reimbursed Hatemi.  "Courts do not usually raise claims or

arguments on their own.  But federal courts have an independent obligation to

10

ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, ___ U.S. ___, 131 S. Ct. 1197, 1202 (2011) (citation omitted); *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) ("The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties . . . . Federal courts are courts of limited jurisdiction."); *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) ("Although neither party has suggested that we lack . . . jurisdiction, we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*.") (citation omitted).

To bring this case, Hatemi must have constitutional standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning . . . . The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.") (citations omitted).  The standard for constitutional

standing is straightforward.  "[T]he irreducible constitutional minimum of standing

contains three elements.  First, the plaintiff must have suffered an 'injury in fact'—an

invasion of a legally protected interest which is (a) concrete and particularized and

(b) actual or imminent, not 'conjectural' or 'hypothetical.'  Second, there must be a

causal connection between the injury and the conduct complained of—the injury

has to be fairly . . . trace[able] to the challenged action of the defendant, and not . .

. th[e] result [of] the independent action of some third party not before the court.

Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be

'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560–61 (1992) (alterations in the original) (internal quotation marks and citations

omitted).

Here, the EFTA gives Hatemi two ways to assert an injury in fact and to allay

the Court's concern about standing.  The civil liability section of the EFTA creates

liability for failure to comply with the statute and allows plaintiffs to recover "any

actual damage sustained by such consumer as a result of such failure."  15 U.S.C.

§ 1693m(a)(1).  While the aggregate amount of the overdraft fees appears not to be

terribly large compared to the actual damages in most federal cases, Hatemi did

incur those fees and has not actually received reimbursement yet.  Section 1693m

also defines statutory damages and allows plaintiffs to recover "in the case of an

individual action, an amount not less than $100 nor greater than $1,000." 15

U.S.C. § 1693m(a)(2)(A).  "The actual or threatened injury required by Art. III

may exist solely by virtue of statutes creating legal rights, the invasion of which

creates standing . . . . Essentially, the standing question in such cases is whether the

constitutional or statutory provision on which the claim rests properly can be

understood as granting persons in the plaintiff's position a right to judicial relief."

*Warth v. Seldin*, 422 U.S. 490, 500 (1975) (internal quotation marks and citations

omitted); *accord Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d

Cir. 2009).  The EFTA is no different than any other statute whose civil remedies

have undergone an analysis of standing.  "[T]he statutory violation of EFTA is, in

and of itself, an injury-in-fact . . . . if Congress included two forms of damages in the

statute—actual and statutory—Congress intended to create a statutory right and a

mechanism to redress violations thereof."  *Mabary v. Hometown Bank, N.A.*, 888

F. Supp. 2d 857, 860 (S.D. Tex. 2012) (citation omitted); *see also, e.g., Sucec v.*

*Greenbrier*, No. 5:11-CV-0968, 2012 WL 3079233, at *4 (S.D.W. Va. July 10,

2012) (report and recommendation) ("Clearly, the statute is properly read in favor

of the rights of consumers in Plaintiff's position to allow Plaintiff a right to statutory

damages though he may have no actual damages."), *adopted*, No. 5:11-CV-00968,

2012 WL 3079212 (S.D.W. Va. July 30, 2012).  To the extent that the EFTA's

13

safe-harbor provision[4] might have affected Hatemi's standing, it will not apply here

not only because M & T disputes whether any violations occurred but also because

it has not finalized its policy changes or reimbursed Hatemi yet.  As a result, Hatemi

would be able to pursue both reimbursement of his overdraft fees and independent

statutory damages.  Pursuit of those remedies suffices to establish an injury in fact.

The Court thus is satisfied that Hatemi has standing and that it has subject-matter

jurisdiction.

### B)       *Did Hatemi agree to arbitrate his claim about overdraft services?*

The Court now turns to the central issue in the pending motion, whether

Hatemi agreed to arbitrate overdraft fees because he agreed to arbitrate any "dispute

or controversy that arises out of or is related" to his checking account.  "Arbitration

is strictly a matter of consent, and thus is a way to resolve those disputes—*but only*

*those disputes*—that the parties have agreed to submit to arbitration.  Applying this

principle, our precedents hold that courts should order arbitration of a dispute only

where the court is satisfied that neither the formation of the parties' arbitration

agreement *nor* (absent a valid provision specifically committing such disputes to an

arbitrator) its enforceability or applicability to the dispute is in issue.  Where a party

---

[4] "A person has no liability under this section for any failure to comply with any requirement under this subchapter if, prior to the institution of an action under this section, the person notifies the consumer concerned of the failure, complies with the requirements of this subchapter, and makes an appropriate adjustment to the consumer's account and pays actual damages or, where applicable, damages in accordance with section 1693h of this title."  15 U.S.C. § 1693m(e).

contests either or both matters, 'the court' must resolve the disagreement." *Granite Rock Co. v. Int'l Bd. of Teamsters*, 130 S. Ct. 2847, 2857–58 (2010) (internal quotation marks and citations omitted); *see also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 364 (2d Cir. 2003) ("While the FAA [Federal Arbitration Act] expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, *but not more so.*") (internal quotation marks and citations omitted). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citations omitted).

Here, the plain language of the Agreement does not include any contract regarding any aspect of overdraft services, let alone arbitration of overdraft services. Based on its own internal pagination, the Agreement is a booklet that contains 52 pages of substantive text. Out of those 52 pages, M & T saw fit to designate half of the very first page for a section titled, "Governing Documents." That section lists six explicit documents that constitute the "governing documents for your account" and then states unequivocally that those six documents "are the final and complete agreement between you and us concerning your account." (Dkt. No. 15-2 at 7.)

15

Through that language, M & T chose not only to leave overdraft services off of the

list of governing documents but also to foreclose any possibility that extrinsic,

contemporaneous documents concerning overdraft services could modify the "final

and complete agreement" concerning Hatemi's checking account.  To emphasize

the discrete and final nature of the list of governing documents even further, M & T

proleptically answered its own argument about verbal consent by adding, "Any

statement concerning your account made by any of our employees or anyone else is

not part of that agreement." (*Id.*)  The explicit language on the very first

substantive page of the Agreement, combined with the parties' admission that no

written consent for overdraft services exists, leaves M & T in a situation in which 1)

no written contract for overdraft services ever occurred; 2) for purposes of the

Agreement and issues related to it, a written contract for overdraft services would be

irrelevant anyway because it would not be a governing document; and 3) again for

purposes of the Agreement and issues related to it, any purported verbal contract for

overdraft services would be void as a "statement concerning your account" that is

not part of the Agreement.  As the Court quoted previously, the few references in

the entire Agreement to overdraft services flow from M & T's exclusion of overdraft

services, since they read as if an "Overdraft Arrangement" is an outside event that

may or may not happen apart from the Agreement.  In fact, if overdraft

arrangements occur at all then they must occur apart from account agreements; banks have to provide notice "segregated from all other information" about an account, 12 C.F.R. § 205.17(b)(1)(i); *see also* 12 C.F.R. § 1005.17(b)(1)(i) (same); and the notice "shall be substantially similar to Model Form A–9 set forth in Appendix A of this part, include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph." 12 C.F.R. § 205.17(d); see also 12 C.F.R. § 1005.17(d) (same).  Model Form A-9, in turn, is a separate document that includes check-off lines at the bottom for consent or refusal, along with lines for the date and the customer's printed name and account number.

Under these circumstances, the arbitration provision in the Agreement, as broad as it is, stops at the six governing documents that Hatemi contractually entered with M & T.  *Cf. Dedon GmbH v. Janus et Cie*, 411 F. App'x 361, 364 (2d Cir. 2011) (summary order) ("Janus also argues that the exclusive distribution agreement should be encompassed within the meaning of 'pre-contractual and collateral obligations' to the purchase orders.  Janus would thus have this court find that 'any dispute related to any obligation arising prior to or outside of the contract formed by each shipment of goods' is governed by the purchase orders' terms and conditions.  (emphasis in original)  We decline to adopt Janus's broad reading of

that contractual language, as it ignores the plain language of the purchase order, and we agree with the district court that the terms and conditions do not provide an alternative basis for compelling arbitration."). Forcing arbitration for either a written consent that never existed or a verbal consent nullified on the first page of the Agreement would require adding a seventh governing document and deleting the prohibition on verbal statements. Nothing in the record supports editing the parties' manifested intent that much. "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. The best evidence of what parties to a written agreement intend is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (internal quotation marks and citations omitted).

M & T's principal case in support of its motion, *Given v. M & T Bank Corp. (In re Checking Account Overdraft Litig.)*, 674 F.3d 1252 (11th Cir. 2012), does not change the above analysis. In *Given*, the plaintiff "was charged overdraft fees of $370" and subsequently "filed a putative class action against M&T Bank in Maryland federal district court, alleging that the bank had improperly 'manipulate[d] and reorder[ed] debits and credits from highest to lowest' to

increase the bank's revenue from overdraft fees."  674 F.3d at 1254.  M & T has

suggested that plaintiff Given had the same account agreement and the same

arbitration clause as Hatemi has here.  (*See* Dkt. No. 15-3 at 6 n.12.)  If so then

Given's dispute about the timing and ordering of debits and credits would have

fallen under the explicit sections of the Agreement that begin with the heading,

"Order In Which We Post and Pay Debit Items and Most Fees."  (Dkt. No. 15-2 at

10.)  The arbitration provision thus covered Given's dispute; Given's account

agreement would have been a governing document, and her arbitration provision

would have extended to services described explicitly in the plain language of any

governing document.  From the Court's reading of the *Given* case, plaintiff Given at

no time raised an issue about a service explicitly left off of the list of her governing

documents.

## IV)   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying

M & T's motion to compel arbitration (Dkt. No. 15).

## V) OBJECTIONS

A copy of this Report and Recommendation will be sent, on the date below,

to counsel for M & T by electronic filing on the date below; the Court will mail on

the date below a hard copy of this Report and Recommendation to Hatemi, via

first-class mail.  Any objections to this Report and Recommendation must be

electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C.

§ 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error

or omission in a magistrate judge's report waives further judicial review of the

point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

     SO ORDERED.

                    /s Hugh B. Scott
                    HONORABLE HUGH B. SCOTT
                    UNITED STATES MAGISTRATE JUDGE

DATED: June 3, 2014